William G. Caldes (SBN 00062-1995)
John A. Macoretta (SBN 03912-1990)
Diana J. Zinser (*pro hac vice forthcoming*)
SPECTOR ROSEMAN & KODROFF, P.C.
2001 Market Street, Suite 3420
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
bcaldes@srkattorneys.com
jmacoretta@srkattorneys.com
dzinser@srkattorneys.com

Michael S. Smith (*pro hac vice forthcoming*)
Michael D. Hanify (*pro hac vice forthcoming*)
PRETI, FLAHERTY, BELIVEAU & PACHIOS, LLP
One City Center, P.O. Box 9546
Portland, ME  04112-9546
Tel.: (207) 791-3000
Fax: (207) 791-3111
msmith@preti.com
mhanify@preti.com

*Attorneys for Plaintiff and the Proposed Class*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| CITY OF AUGUSTA, KENNEBEC COUNTY, MAINE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>AXON ENTERPRISE, INC.; and SAFARILAND, LLC,<br><br>Defendants. | **CASE NO.** 3:23-cv-20897<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

I.   NATURE OF ACTION .................................................................................. 1

II.  PARTIES ..................................................................................................... 6

    A.   Plaintiff ............................................................................................... 6

    B.   Defendants ........................................................................................... 6

III. JURISDICTION,  VENUE,  AND  COMMERCE .................................... 7

IV.  THE RELEVANT MARKETS .................................................................... 9

    A.   Product and Geographic Market – Long-Range CEWs ................................. 9

    B.   The Long-Range CEW Market Is Highly Concentrated and Axon Exercises Market Power Within It ............................................................................. 11

    C.   The Long-Range CEW Market Has High Barriers to Entry ......................... 13

    D.   Product and Geographic Market – BWC Systems ..................................... 15

    E.   The BWC System Market Is Highly Concentrated and Axon Exercises Market Power Within It ................................................................................. 16

    F.   The BWC System Market Has High Barriers to Entry ............................... 18

    G.   Product and Geographic Market – Long-Range CEW Holsters ................... 20

    H.   During the Life of the Holster Agreement, Safariland Exercised Monopoly Power over the Long-Range CEW Holster Market. .............................................. 20

V.   AXON  AND  SAFARILAND'S  CONDUCT  TO  MONOPOLIZE  THE  LONG-RANGE CEW AND BWC SYSTEM MARKETS ...................................... 21

VI.  HARM TO COMPETITION AND ANTITRUST INJURY ........................... 25

VII. CLASS  ACTION  ALLEGATIONS ........................................................... 27

VIII. CONTINUING VIOLATION .................................................................... 31

IX.  TOLLING .................................................................................................. 31

X.   CAUSES OF ACTION .............................................................................. 32

XI.  REQUEST FOR RELIEF ........................................................................... 42

XII. JURY  TRIAL  DEMANDED .................................................................... 44

i

Plaintiff City of Augusta, Kennebec County, Maine ("Plaintiff"), on behalf of itself and all others similarly situated, brings this action against Defendants Axon Enterprise, Inc. ("Axon") and Safariland, LLC ("Safariland") pursuant to Federal Rule of Civil Procedure 23. Plaintiff, by and through its undersigned counsel, alleges as follows upon personal knowledge as to its own conduct, and upon information and belief as to all other matters, the bases of which are the investigation of its counsel, public filings, other publicly available documents, news reports, and the Federal Trade Commission's ("FTC's") administrative complaint against Defendants, *Axon Enterprise, Inc.*, FTC Dkt. No. D9389, ¶ 30 (Jan. 3, 2020). Plaintiff brings this action for treble damages under the antitrust laws of the United States against Defendants and demands a trial by jury.

## I.      NATURE OF ACTION

1.      This case concerns Axon's scheme to unlawfully obtain and maintain its monopolies in two highly lucrative law enforcement and self-defense markets: long-range conducted energy weapons ("CEWs"), which are commonly known by Axon's brand name, "Taser"; and body-worn camera ("BWC") systems, which allow police departments to record, store, and use video evidence collected while police officers are on duty.[1]

2.      Axon facilitated its monopolies over long-range CEWs and BWC systems by acquiring its largest competitor in the BWC system market, VieVu, from Safariland and signing 12-year non-compete, market allocation, and no-poach agreements with Safariland to prevent Safariland from challenging its monopolies in either market. Axon enticed Safariland to agree to its acquisition by granting Safariland a preferred supply contract for Taser holsters.

3.      Axon continues to unlawfully maintain its monopoly power in both the long-

---

[1] For ease of reference, this Complaint uses the terms "police departments" and "police officers" to refer collectively to all state and local law enforcement units (including police departments, sheriff's offices, and similar) and all state and local law enforcement officers, respectively.

range CEW market and the BWC system market through bundling and excessively long supply contracts, which often stretch up to 12 years. These tactics have prevented new entrants from challenging Axon for market share and have led to higher prices than there would have been in competitive markets.

4.     Axon, then known as Taser International, first developed the modern long-range CEW in 2003, when it started distributing its Taser X26 weapon. Unlike other CEWs such as stun guns, which deliver an electric shock to their target by making direct contact, the Taser X26 fires a barbed probe at its target, allowing the shock to be delivered at long range (up to 35 feet away).[2] The Taser X26 "captured the market" by allowing police officers to easily and effectively disarm suspects from a safe distance, instead of forcing officers to make physical contact and risk hand-to-hand combat with a suspect when delivering the shock.[3]

5.     Axon has developed subsequent generations of long-range CEWs, all of which use the "Taser" brand name and operate similarly to the Taser X26. In 2016, Axon developed the Taser Pulse, a long-range CEW for civilian self-defense use.[4]

6.     Axon does not have any meaningful competition and dominates the long-range CEW market.

7.     Long-range CEWs themselves must be used in conjunction with components, including the electricity cartridges that supply the charge—which must be replaced each time the long-range CEW is fired—and holsters that secure the long-range CEW to the officer's duty belt.

8.     Axon also started to include cameras on its Tasers, and by 2008, it developed a

---

[2] *How Conducted Energy Devices Work*, Nat'l Inst. Just. (June 22, 2008), https://nij.ojp.gov/topics/articles/how-conducted-energy-devices-work.
[3] Lisa Girion, *The X26*, Reuters (Sept. 21, 2017), https://www.reuters.com/investigates/special-report/usa-taser-x26/.
[4] Edgar Alvarez, *Taser's Smallest Weapon Ever Is for Civilians, Not Cops*, Engadget (Jan. 9, 2016), https://www.engadget.com/2016-01-19-taser-pulse.html.

standalone BWC system, which allowed officers to record, store, and use video footage.[5] BWC systems are comprised of hardware: body-worn cameras ("BWCs" or "body cameras"), and software: digital evidence management systems ("DEMS"), which integrate with body cameras to store, categorize, and use the data they collect. Police departments need the BWC hardware to integrate with DEMS software to efficiently comply with the many regulations and protocols for storing and using BWC data.

9.    By the mid-2010s, demand for both long-range CEWs and BWC systems was increasing rapidly in the wake of the shooting of Michael Brown in Ferguson, Missouri and the civil unrest that followed, as protestors demanded more oversight over police and less police reliance on firearms.[6] At the same time, Axon had obtained a dominant position in both markets, with 95% of the long-range CEW market and 70% of the BWC system market.[7]

10.    Axon guarded its dominant positions in these markets by enforcing patents against potential long-range CEW competitors and by signing long-term contracts with police departments for long-range CEW and BWC system supply. These tactics forced long-range CEW competitors out of business and limited the potential for new entrants in the long-range CEW and BWC system markets.

11.    Despite Axon's efforts, VieVu emerged as an upstart in the BWC system market in 2015–16. Until Axon's acquisition of VieVu, VieVu was owned by Safariland, which manufactured gun holsters, body armor, and riot gear. VieVu competed with Axon for BWC system contracts by offering lower prices to police departments. This competition forced Axon to lower prices on its BWC systems. Axon admitted that VieVu was "undercutting" the company on price

---

[5] Mario Aguilar, *How Police Body Cameras Were Designed to Get Cops Off the Hook*, Gizmodo (Mar. 16, 2015), https://gizmodo.com/how-police-body-cameras-were-designed-to-get-cops-off-t-1691693677.
[6] *Id*.
[7] Luke Schiefelbein, *Why Taser Stock Could Have Shocking Upside*, Forbes (Mar. 3, 2018), https://www.forbes.com/sites/lukeschiefelbein/2018/03/13/why-taser-stock-could-have-shocking-upside/?sh=2ceb854477d7.

for BWC systems, while VieVu's CEO noted that VieVu has started a "price war" with Axon. By 2018, VieVu was the second-largest producer of BWC systems and Axon's main competitor.

12.     Recognizing the competitive threats from VieVu and Safariland, Axon acquired VieVu from Safariland on May 3, 2018. Axon used this acquisition to entrench its position in both markets by eliminating its main competitor in BWC systems and preventing a possible competitor in long-range CEWs through market-allocation and no-poach agreements.

13.     Pursuant to the acquisition, Axon and Safariland entered into several decade-plus-long market allocation agreements, including a Product Development and Supplier Agreement ("Holster Agreement"). Under the Holster Agreement, Axon granted Safariland the status of preferred holster supplier of Axon's Tasers, and Safariland agreed to refrain from developing any long-range CEWs for 12 years. Axon and Safariland also signed no-poach, non-solicitation and customer-allocation agreements, agreeing not to compete for customers or employees in any line of their businesses. The VieVu acquisition and related market-allocation agreements, in effect, eliminated Safariland as a potential competitor to Axon in the long-range CEW market and VieVu as a competitor in the BWC system market.

14.     At the same time, the Holster Agreement allowed Safariland to avoid competition with Axon and other long-range CEW holster manufacturers.

15.     The FTC filed an administrative complaint on January 3, 2020 against Axon and Safariland to challenge Axon's acquisition of VieVu, as well as the related agreements between Axon and Safariland. The FTC complaint, which was approved by all five FTC commissioners, alleged that Axon and Safariland had monopolized and harmed competition in the BWC system market, in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, and Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18. The FTC complaint alleged that the acquisition

4

would increase market concentration and harm competition, while the additional non-compete provisions would "substantially lessen competition" with no significant countervailing factors.[8] Safariland settled with the FTC on April 17, 2020, rescinding the Holster Agreement and associated market-allocation, non-solicitation, and no-poach agreements. [9] The FTC's administrative litigation against Axon is still pending.

16.     Despite Safariland rescinding the Holster Agreement and non-compete agreements, Axon remains dominant in the long-range CEW market. Barriers to entry remain high for competitors to develop a long-range CEW, with significant costs and lead time related to development, sales, and training. Axon also retains several patents for its Taser CEWs, further limiting competitors' ability to develop long-range CEW substitutes to Tasers. Prices for Tasers - as well as components like cartridges and holsters - have remained at supracompetitive levels.

17.     Since Axon's acquisition of VieVu, Axon has also continued to dominate the BWC system market, with a 2021 market share of 70%.[10] Prices for BWC systems have increased and remain at supracompetitive levels.

18.     Municipalities like Plaintiff City of Augusta, Kennebec County, Maine have been harmed in the form of higher prices for long-range CEWs, BWC systems, and long-range CEW holsters that they purchased after Axon's acquisition of VieVu and related non-compete agreements with Safariland.

19.     From May 3, 2018 until the effects of Defendants' unlawful conduct cease (the "Class Period"), as a direct and proximate result of Axon and Safariland's anticompetitive

---

[8] Complaint, *Axon Enter., Inc.,* FTC Dkt. No. D9389, ¶¶ 44–56 (Jan. 3, 2020).

[9] Press Release, FTC, *VieVu's Former Parent Company Safariland Agrees to Settle Charges that It Entered Into Anticompetitive Agreements with Body-Worn Camera Systems Seller Axon* (Apr. 17, 2020), https://www.ftc.gov/news-events/news/press-releases/2020/04/vievus-former-parent-company-safariland-agrees-settle-charges-it-entered-anticompetitive-agreements.

[10] Rich Duprey, *How Big Is the Threat Axon Enterprise Faces from Motorola Solutions?*, Motley Fool (Feb. 26, 2021), https://www.nasdaq.com/articles/how-big-is-the-threat-axon-enterprise-faces-from-motorola-solutions-2021-02-26.

conduct described herein, Plaintiff and the Class paid higher prices for long-range CEWs, BWC systems, and/or long-range CEW holsters than they would have paid in a competitive market.

## II.    PARTIES

### A.    Plaintiff

20.    Plaintiff City of Augusta is a municipality located in Kennebec County and the state capital of Maine. As a municipality organized and existing pursuant to the laws of Maine, Plaintiff manages operations of the Augusta Police Department, which directly purchased Taser-branded CEWs, their components, BWCs, and/or a DEMS subscription at unlawfully inflated prices.

### B.    Defendants

21.    Defendant Axon Enterprise, Inc. is a public corporation organized and existing under the laws of the State of Delaware. Axon's principal place of business is located at 17800 North 85th Street, Scottsdale, Arizona. Axon, which was known as Taser International, Inc. until 2017, is the dominant manufacturer of long-range CEWs through its eponymous "Taser"-branded weapons. Axon also dominates the market for BWC systems through its Axon-branded BWCs and its DEMS, Evidence.com.

22.    Defendant Safariland, LLC is a limited liability company organized and existing under the laws of the State of Delaware. Safariland is wholly owned by Cadre Holdings, Inc., a corporation organized and existing under the laws of the State of Delaware. Cadre Holdings' principal place of business is located at 13386 International Parkway, Jacksonville, Florida. Safariland is a leading holster manufacturer that sold BWC system competitor VieVu to Axon and agreed not to compete with Axon in order to become Axon's preferred Taser holster supplier.

6

### III.    JURISDICTION,  VENUE,  AND  COMMERCE

23.    This action arises under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1–2), and Sections 7 and 16 of the Clayton Act (15 U.S.C. §§ 18, 26). This action seeks injunctive relief, compensatory damages, treble damages, costs of suit, and reasonable attorney's fees.

24.    This Court has federal-question subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337, and Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26).

25.    Venue is proper in this District under 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b), (c), and (d) because at all times relevant to the Complaint: (a) Defendants transacted business or acted through subsidiaries or agents present in this District; (b) a substantial part of the events giving rise to Plaintiff's claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this District, including:

A.    Axon negotiated contracts with purchasers in this District to provide Tasers, BWC systems, and Taser components, including to members of the Class;

B.    Axon delivered Tasers, BWC systems, and Taser components to purchasers in this District, including to members of the Class;

C.    Safariland delivered Taser holsters to purchasers in this district, including to members of the Class;

D.    Safariland provided Taser holsters that Axon included in its contracts with purchasers and delivered to purchasers in this District, including to members of the Class.

26.    Axon and Safariland participated in a market-allocation conspiracy, which enabled Axon to unlawfully monopolize the United States markets for long-range CEWs and BWC systems, products within the flow of the interstate commerce of the United States.

7

27.     Axon markets and delivers long-range CEWs, and BWCs systems, and long-range CEW components to purchasers across state lines. Axon makes and receives substantial payments across state lines for and from the sale of long-range CEWs, BWC systems, and long-range CEW components, and Axon's business activities that are the subject of this Complaint are within the flow of, and have substantially affected, the interstate commerce of the United States. During the Class Period, Axon used the instrumentalities of interstate commerce, including interstate wires, in furtherance of its conspiracy to monopolize the markets for long-range CEWs and BWC systems as well as its attempted or actual monopolization of the markets for long-range CEWs and BWC systems.

28.     Safariland markets and delivers long-range CEW holsters to purchasers across state lines. Safariland makes and receives substantial payments across state lines for and from the sale of long-range CEW holsters, and Safariland's business activities that are the subject of this Complaint are within the flow of, and have substantially affected, the interstate commerce of the United States. During the Class Period, Safariland used the instrumentalities of interstate commerce, including interstate wires, in furtherance of its conspiracy to monopolize the markets for long-range CEWs and BWC systems.

29.     This Court has personal jurisdiction over Axon and Safariland because Axon and Safariland transacted business, maintained substantial contacts, and committed overt acts in furtherance of their market-allocation conspiracy and conspiracy to monopolize the markets for long-range CEWs and BWC systems, as well as Axon's attempt to monopolize, or its actual monopolization of, the markets for long-range CEWs and BWC systems in the United States, including in this District. Axon and Safariland should, therefore, have foreseen the possibility of being brought before this Court to answer for any illegal acts related to their business conducted

here.

30.    Axon and Safariland's anticompetitive conduct was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

## IV.    THE RELEVANT MARKETS

### A.    Product and Geographic Market – Long-Range CEWs

31.    This action alleges three relevant product markets. The first relevant product market at issue in this action is long-range CEWs.

32.    Long-range CEWs are a type of "less-lethal" weapon, which is a class of weapons that can be used "to deal with a threat to the public, bystanders or police, from violent or armed individuals prior to it escalating to a level where firearms would otherwise have to be used."[11] Less-lethal weapons include CEWs (both long-range CEWs like Tasers and traditional CEWs like stun guns), pepper spray, tear gas, rubber bullets, and other types of riot gear, which are less likely to injure or kill their target.[12] Less-lethal weapons are a key part of a police officer's arsenal to subdue threatening individuals without resorting to deadly force.[13]

33.    Long-range CEWs are highly differentiated from other types of less-lethal weapons because of their accuracy, effectiveness, and versatility. Unlike traditional stun guns or pepper spray, long-range CEWs can be used on targets up to 35 feet away.[14] Further, unlike other long-range less-lethal weapons like tear gas and rubber bullets, long-range CEWs are designed to be used on a single person and can be highly accurate up to more than 30 feet

---

[11] Defence & Security Accelerator UK Home Off., *Competition Document: Advancing Less Lethal Weapons* (2020), https://www.gov.uk/government/publications/competition-advancing-less-lethal-weapons/competition-document-advancing-less-lethal-weapons.
[12] Kelsey D. Atherton, *What 'Less Lethal' Weapons Actually Do,* Scientific Am. (June 23, 2020), https://www.scientificamerican.com/article/what-less-lethal-weapons-actually-do.
[13] *How Conducted Energy Devices Work, supra* note 2.
[14] Joint Intermediate Force Capabilities Off., *TASER® X26TM*, U.S. Dep't of Defense Non-Lethal Weapons Program, https://jnlwp.defense.gov/Current-Intermediate-Force-Capabilities/X26-Taser/ (last visited Sep. 13, 2023).

away.[15]

34.     Long-range CEWs themselves must be used in conjunction with components, including the electricity cartridges that supply the charge—which must be replaced each time the long-range CEW is fired—and holsters that secure the long-range CEW to the officer's duty belt. Police departments prefer to buy these components in an all-inclusive supply contract with the long-range CEW manufacturer, which saves the police departments time and resources compared to buying component parts separately.

35.     Long-range CEW use is widespread. As of 2018, two-thirds of police departments use long-range CEWs,[16] and as of 2020, an estimated 73% of police officers carry long-range CEWs when on duty.[17]

36.     Because of long-range CEWs' differentiation from other less-lethal weapons, long-range CEWs are a vital tool for law enforcement, and they cannot be easily replaced by other less-lethal or lethal weapons. Recognizing this differentiation, Tom Shea, the program director of the Police Graduate Studies Program at Seton Hall University and a former police lieutenant, "said it's hard to imagine not arming police with Tasers. 'When someone's holding a knife and is violent and obviously irrational and out of his mind on drugs, those are situations where Tasers are absolutely necessary, because otherwise, you're going resort to deadly force.'"[18] Currently and throughout the class period, no substitutes exist for long-range CEWs.

---

[15] Warren Wilson, *Why I Think the TASER 10 May Be the Most Effective Less Lethal Device in History*, Police1 (Feb. 12, 2023), https://www.police1.com/police-products/less-lethal/taser/articles/why-i-think-the-taser-10-may-be-the-most-effective-less-lethal-device-in-history-dmpdMBS5efSNTL6l/.

[16] Laurel Wamsley, *Taser Changes Its Name to Axon and Offers Free Body Cameras for Police*, NPR: The Two-Way (Apr. 7, 2017), https://www.npr.org/sections/thetwo-way/2017/04/07/522878573/we-re-more-than-stun-guns-says-taser-as-it-changes-company-name.

[17] Univ. of Mich. Inst. for Soc. Res., *Weapons Authorized for Full-Time Sworn Officers/Deputies: Conducted Energy Device (e.g. Taser)* (2020), https://www.icpsr.umich.edu/web/NACJD/studies/38651/datasets/0001/variables/EQ_CED?archive=nacjd.

[18] Ken Serrano, *Tasers, Hailed as a Way to Avoid Deadly Police Shootings, Are Seldom Used in NJ,* Asbury Park Press (Apr. 18, 2022), https://www.app.com/story/news/local/public-safety/2021/11/08/police-taser-gun-use-nj-how-often-fired/8572510002/.

37.     For the same reasons that police officers prefer to use long-range CEWs over other types of less-lethal and lethal weapons, civilians interested in self-defense also prefer to use long-range CEWs: they enable civilians to incapacitate a would-be attacker at a safer distance and more effectively than other CEWs and less-lethal weapons.

38.     When compared with other CEWs, and as shown in the graph below, revenue from long-range CEWs outpaces revenue from all other CEW types combined.[19]



B.      **The Long-Range CEW Market Is Highly Concentrated and Axon Exercises Market Power Within It**

39.     In 2022, American police departments spent $377 million on purchasing CEW devices and components, most of which was spent on long-range CEWs.[20] Axon is effectively the sole player in the market, with 95% market share.[21] Axon has no notable competitors in long-range CEW manufacturing, as only a handful—if any—police departments use non-Axon CEWs. Axon drove the only other notable competitor making long-range CEWs, Phazzer, out of

[19] Mordor Intelligence, *US Conducted Energy Weapons Market (2023–2028)*, at 25 (2023).
[20] *Id*. at 32.
[21] Inkwood Research, *United States Conductive Electrical Weapons Market 2023–2030*, at 36 (2023); Schiefelbein, *supra* note 7.

business after Phazzer was enjoined from manufacturing long-range CEWs.[22]

40.    Axon enjoys healthy profits from its Taser-branded CEWs, with a 63.3% gross margin in 2022 and 183% revenue growth from 2018–2022.[23] Axon also enjoys healthy profits selling necessary components to its Taser-branded CEWs, including batteries, mounts, and cartridges, which supply the electricity for the shock and must be each replaced each time the weapon is fired. In 2022, over 40% of Axon's Taser-related revenue derived from non-weapon sales, most of which was attributable to electricity cartridges.[24] Sales of these cartridges are expected to grow within the coming years.[25]

41.    Axon's high operating margins and overwhelming market share dominance show that the long-range CEW market is highly concentrated, with Axon exercising significant monopoly power.



**5.2 BY EQUIPMENT TYPE**

CONDUCTED ENERGY WEAPONS MARKET, VALUE IN USD MILLION, BY
EQUIPMENT TYPE, UNITED STATES, 2018-2028

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cartridges | 81.50 | 102.86 | 131.79 | 166.88 | 229.71 | 246.33 | 263.06 | 279.84 | 296.61 | 313.91 | 330.85 |
| Weapon | 121.91 | 154.19 | 197.96 | 251.19 | 346.48 | 372.33 | 398.46 | 424.76 | 451.14 | 478.47 | 505.34 |

Source: Mordor Intelligence

---

[22] Mordor Intelligence, *supra* note 19, at 53; Judgment Creditor's Second Amended Proceedings Supplemental Complaint, *Taser Int'l, Inc. v. Phazzer Elecs., Inc.,* ¶ 3, 6:16-cv-366-PGB (M.D. Fla. Apr. 11, 2023), ECF No. 659.
[23] Axon Enterprise, Inc. Form 10-K, at 41 (Feb. 28, 2023); Mordor Intelligence, *supra* note 19, at 27.
[24] Axon Enterprise, Inc. Form 10-K, *supra* note 23, at 39.
[25] Mordor Intelligence, supra note 19, at 29.

42.     The relevant geographic market for long-range CEWs is the United States, as importing long-range CEWs into the United States is impractical due to their regulation as a crime-control product.[26]

### C.     The Long-Range CEW Market Has High Barriers to Entry

43.     Axon's unlawful monopoly over long-range CEWs is durable because it benefits from significant barriers to entry. The primary barriers to entry are its patents, contract length, relationships with law enforcement, and training costs.

44.     Axon's nearly 300 U.S. patents covering its products, including Tasers, form a key barrier to entry that protects its unlawful monopoly in the market.[27] Axon is unafraid to enforce its patents and so far has instituted 15 lawsuits against would-be competitors, most involving its Tasers.[28] Overall, new entry requires "significant development in research and development to develop technologically advanced and reliable products."[29]

45.     One would-be competitor, Robert Gruder, attempted to launch competing long-range CEW companies Stinger Systems and Karbon Arms. Both times, according to Gruder, Axon "sued [the companies] out of business."[30] Axon secured a permanent injunction against another long-range CEW competitor, Phazzer, preventing Phazzer from selling its long-range CEWs.[31] Potential competitors cannot enter the market to challenge Axon's long-range CEW monopoly because Axon has used its patents to handicap any meaningful competition.

46.     Another key barrier to entry for potential long-range CEW competitors is contract length. Typical supply agreements, which cover the Tasers themselves, cartridges, holsters,

---

[26] *See* Axon Enterprise, Inc. Form 10-K, *supra* note 23, at 11.
[27] Axon Enterprise, Inc. Form 10-K, *supra* note 23, at 39.
[28] Bloomberg Law Docket Report.
[29] Mordor Intelligence, *supra* note 19, at 23; *accord* Inkwood Research, *supra* note 21, at 35.
[30] Matt Stroud, *Meet the Company Trying to Break the Taser Monopoly*, Verge (Feb. 13, 2018), https://www.theverge.com/2018/2/13/17007376/axon-taser-monopoly-digital-ally-wireless.
[31] *Id.*

training, and warranties (among other areas), last 5–10 years—sometimes up to 12 years.[32]

Moreover, Axon often supplies Tasers as part of larger police department supply contracts, which

last similar durations and include supply of BWC systems and records management.[33]

47.    Would-be competitors are forced to wait out these lengthy long-range CEW

supply contracts to have even a chance at winning meaningful business, disincentivizing others

from entering the market. Further, because Axon includes long-range CEWs in its general supply

contracts, companies must provide both long-range CEWs and BWC systems to compete for those

police departments that prefer to integrate their long-range CEW and BWC system supply.

48.    Axon's relationships with police departments serve as another barrier to entry.

Long-range CEWs are supplied to police departments by direct sales representatives through

supply contracts.[34] Because long-range CEWs are such indispensable weapons used in life-or-

death situations, police departments need to trust in the long-range CEW supplier to provide

effective, useful weapons. Axon's long-tenured sales force "has a customer relationship with

over 95% of state and local law enforcement agencies in the United States," which has been able

to build trust in Axon's Taser-branded CEWs.[35] Would-be competitors would need to build trust

in their alternative long-range CEWs with police departments, an endeavor that would take

considerable time and resources. Axon acknowledges as much, noting that its "sales force and

strong customer relationships represent key strategic advantages."[36]

49.    Training costs represent another barrier to entry. Axon includes Taser training in

its typical supply contracts,[37] and police departments that provide Tasers have trained a

---

[32] *See, e.g.,* Stockbridge Dec. 28, 2021 Purchase Contract.
[33] *See, e.g.,* Okla. City Aug. 15, 2021 Master Services & Purchasing Agreement.
[34] Axon Enterprise, Inc. Form 10-K, *supra* note 23, at 7.
[35] *Id.*
[36] *Id.*; Mordor Intelligence, *supra* note 19, at 23.
[37] *See, e.g.,* Stockbridge Dec. 28, 2021 Purchase Contract; Okla. City Aug. 15, 2021 Master Services & Purchasing Agreement.

significant proportion of police officers in Taser use and protocol.[38] Would-be competitors wishing to sell their own long-range CEWs would need to entice police departments to retrain their police force to use a new type of long-range CEW.

50.     Regulations pose a final barrier to potential new entrants, which must ensure their long-range CEWs comply with a variety of state and local laws governing less-lethal weapons.[39]

### D.     Product and Geographic Market – BWC Systems

51.     The second relevant product market at issue in this action is BWC systems. Police departments need to integrate BWCs and DEMS into a BWC system because the products are closely related, as they need to efficiently store, categorize, and use the data their officers collect from body cameras. Further, police departments often issue requests for proposals for purchasing BWCs and DEMS together as an integrated BWC system.

52.     Axon requires police departments to integrate Axon BWCs with Evidence.com, Axon's DEMS, because Axon body cameras only work with Evidence.com.[40]

53.     No substitutes exist for integrated BWC systems. Other recording systems, such as in-car camera systems, cannot record interactions outside of the view of the car, or when officers patrol on foot or bicycle. Further, seven states now require law enforcement to use body cameras while on duty.[41] In-car cameras also tend to be more expensive than body cameras.

54.     Similarly, records management systems are not a useful substitute for BWC systems because, unlike DEMS, records management systems do not store or categorize video and audio evidence produced by body cameras.

---

[38] Aaron Smith, *Axon Is Watching You, and Seeing a Bright Future in Police Cameras and Tasers*, Forbes (Feb 10, 2021), https://www.forbes.com/sites/aaronsmith/2021/02/10/axon-is-watching-you-and-seeing-a-future-in-police-cameras-and-tasers/?sh=358cc7f95228.

[39] Inkwood Research, *supra* note 21, at 42–43.

[40] *In the Police Body Camera Business, the Real Money's on the Back End*, Marketplace (Apr. 18, 2017), https://www.marketplace.org/2017/04/18/police-body-camera-business-real-moneys-on-back-end/.

[41] Nat'l Conf. of State Legislatures, *Body-Worn Camera Laws Database* (2021), https://www.ncsl.org/civil-and-criminal-justice/body-worn-camera-laws-database.

55.     BWC system use is widespread. In 2022, nearly half of police departments in the United States used body cameras, and seven states currently have laws requiring police officers to use them. And where police departments use body cameras, over 90% of prosecutors use body camera evidence to prosecute civilians—so police departments' operations depend on having body camera footage integrated into their evidence system.[42]

56.     The relevant geographic market for BWC systems is the United States. Because of differing laws and rights for evidence collected from body cameras outside of the United States, police departments within the United States cannot substitute BWC systems offered within the United States for those offered to police outside of the United States. Further, American police departments must often comply with the FBI's Criminal Justice Information Services ("CJIS") standards, and they generally use other American police departments to vet potential BWC system vendors.

**E.     The BWC System Market Is Highly Concentrated and Axon Exercises Market Power Within It**

57.     In its administrative complaint against Axon and Safariland, the FTC noted that Axon was the market leader for BWC systems, with VieVu as the next largest competitor.[43] Axon remains the market leader in providing BWC systems. Its only significant competition comes from Motorola, which purchased competitor WatchGuard in 2019 but is still not as established as VieVu was in 2018.[44]

---

[42] Lily Robin & Susan Nembhard, *What Can Policymakers Expect of Body-Worn Cameras in Law Enforcement after a Decade of Use?,* Urban Inst. (July 14, 2022), https://www.urban.org/urban-wire/what-can-policymakers-expect-body-worn-cameras-law-enforcement-after-decade-use#:~:text=Proposed%20uses%20of%20body%2Dworn,the%20police%20perspective%20on%20events.

[43] Complaint, *Axon Enter., Inc.,* FTC Dkt. No. D9389, ¶ 30 (Jan. 3, 2020).

[44] Akela Lacy, *Two Companies Fight to Corner the Police Body Camera Market*, Intercept (Dec. 8, 2021), https://theintercept.com/2021/12/08/police-reform-body-cameras-axon-motorola/; Press Release, *Motorola Solutions, Motorola Solutions Acquires WatchGuard, Inc., Leader in Mobile Video for Public Safety* (July 11, 2019), https://www.bloomberg.com/press-releases/2019-07-11/motorola-solutions-acquires-watchguard-inc-leader-in-mobile-video-for-public-safety; Cal. Dep't of Tech., *Stage 2 Alternative Analysis 9* (2021),

58.     In 2018, VieVu was Axon's closest competitor.

59.     The Herfindahl-Hirschman Index ("HHI") measures and grades market concentration by adding the squared market share percentages of each competitor in the market. HHIs range from 0 in markets with no concentration to 10,000 in markets where one firm has 100 percent market share. According to the Horizontal Merger Guidelines issued by the Department of Justice ("DOJ") and the Federal Trade Commission ("FTC"), a merger that increases the HHI by more than 200 and results in an HHI above 2,500 in any market is presumed to be anticompetitive, and therefore unlawful.[45]

60.     According to FTC estimates, in 2018, Axon's acquisition of VieVu increased total market concentration by more than 200 HHI points and created a post-merger HHI exceeding 2,500 points.[46]

61.     Adding to this high market concentration, BWC system contracts generally last for 5– 10 years, limiting the ability of other BWC system providers to compete with Axon. Further limiting competition, police departments have high switching costs between BWC systems, as police departments must learn complex, new procedures for storing and using evidence. Axon is well aware of these high switching costs: in 2017, it offered free body cameras to police departments, which came with a one-year trial subscription to Evidence.com.[47] Those "free" cameras enticed police departments into using the Axon BWC system, because Axon's body cameras only work with Axon software. Safariland's then-Executive

---

https://projecttracking.technology.ca.gov/Download?documentid=5c1a7af8-e80c-42a7-8f00-384a51f0ccc6&projectid=3600-079.

[45] DOJ & FTC, *Horizontal Merger Guidelines* 19 (2010). The DOJ and FTC have released draft merger guidelines, which presume anticompetitive any merger that increases HHI by more than 100 points and results in a market HHI greater than 1,800. DOJ & FTC, *Draft Merger Guidelines* 7 (2023).

[46] Complaint, *Axon Enter., Inc.,* FTC Dkt. No. D9389, ¶ 34 (Jan. 3, 2020).

[47] Cyrus Farivar, *Taser Stuns Law Enforcement World, Offers Free Body Cameras to All US Police*, ArsTechnica (Apr. 5, 2017), https://arstechnica.com/tech-policy/2017/04/taser-announces-free-body-cameras-cloud-storage- to-all-us-cops-for-a-year/; Elizabeth Joh & Thomas Joo, *The Harms of Police Surveillance Technology Monopolies*, 99 Denv. L. Rev. Forum 1, 17 (2022).

Vice President called the Axon offer for free body cameras a "Venus fly trap" and noted that "there's a whole back end to it that has implementation costs and makes it very difficult to switch out of once you're done."[48]

62.     This "free" Evidence.com subscription also served to entrench Axon's position in the long-range CEW market, since Evidence.com "seamlessly integrates with Tasers." This integration further locked purchasers into the Axon system for both long-range CEWs and BWC systems.[49]

63.     Because of these high switching costs, police departments seldom switch their BWC system provider from one contract to another when a contract is renewed.

64.     Axon further differentiates its BWC systems from those of its competitors by integrating its Tasers with its DEMS. Accordingly, police departments that want to integrate Taser data into their evidence software must use the Axon BWC system.[50]

65.     Axon's unlawful monopolization of BWC systems is further evidenced by its persistent, high profit margins. In 2022, Axon reported $392 million in gross margin in its "software and sensors" department, driven primarily by sales of its BWC systems. With $658 million in net sales from software and sensors, Axon generates a sky-high 60% profit margin from these BWC systems, an extremely high profit margin reflecting its substantial market power.[51]

**F.     The BWC System Market Has High Barriers to Entry**

66.     Similarly, Axon's monopoly power over BWC systems is durable because it benefits from significant barriers to entry. The primary barriers to entry are high capital investment, contract length, switching costs, and integration.

---

[48] *In the Police Body Camera Business, the Real Money's on the Back End, supra* note 40.
[49] Schiefelbein, *supra* note 7.
[50] Inkwood Research, *supra* note 21, at 32.
[51] Axon Enterprise, Inc. Form 10-K, *supra* note 23, at 39.

67.     First, the high capital investment it takes to build out a BWC system represents a significant barrier to entry. Axon developed Evidence.com in 2009 and invested $233.8 million in research and development in 2022.[52] This large amount of capital necessary to develop and service an effective DEMS can only be profitable when costs are spread across a high number of BWC system users. Because the high capital investment needed to develop and maintain a DEMS must be spread across BWC system users, new entrants to the BWC system market must capture a significant proportion of police department contracts to maintain profitability.

68.     Contract length remains another barrier to entry. BWC system contracts can last ten years or longer,[53] limiting the number of police departments with which BWC system suppliers can attempt to contract in any given year. Given the significant capital investment needed to develop and maintain BWC systems, the inability to compete for most police departments at any one time due to contract length further renders market entry unprofitable for would-be competitors.

69.     Switching costs pose another barrier to entry. BWC systems are incredibly complex, with police departments taking months to become fully trained on Evidence.com's capabilities. If a police department does switch BWC systems, it must incur significant IT costs in switching its body camera videos away from the Evidence.com platform.[54] Further, police officers using BWCs also face high switching costs because police officers themselves use them habitually, and retraining police officer habits at scale is difficult.[55]

70.     Finally, product integration is another key barrier to entry. Currently, Axon's BWC systems integrate with its Tasers, and many police departments use Axon to supply both

---

[52] Id. at 42.
[53] See, e.g., Okla. City Aug. 15, 2021 Master Services & Purchasing Agreement.
[54] Schiefelbein, supra note 7.
[55] Id.

long-range CEWs and BWC systems in the same contract.[56] BWC system competitors without long-range CEWs cannot compete for those police departments that want their BWC systems to integrate with long-range CEWs.

### G. Product and Geographic Market – Long-Range CEW Holsters

71.     Long-range CEW holsters are an essential component to long-range CEWs. To be used effectively, long-range CEWs must deploy within a matter of seconds. A holster helps an officer or civilian deploy a long-range CEW quickly by attaching it securely to her belt or person, while keeping the device accessible for use.[57] Holsters are also essential to help police differentiate between a CEW and a firearm, so that police officers do not mistake a gun for a CEW in high-pressure situations.[58] Further, many police departments require officers to carry their long-range CEW in a holster.[59]

72.     Because of these regulations and applications, long-range CEW holsters cannot be substituted with any other products that could secure a long-range CEW.

73.     The relevant geographic market for BWC systems is the United States.

### H. During the Life of the Holster Agreement, Safariland Exercised Monopoly Power over the Long-Range CEW Holster Market.

74.     Because Axon faces effectively no competition in the long-range CEW market, the long-range CEW holster market is defined by those companies that can supply Axon's Tasers.[60]

75.     Most police departments purchase their long-range CEW holsters as part of a supply agreement with Axon for the Tasers themselves. Police departments prefer to purchase

---

[56] *See* Inkwood Research, *supra* note 21, at 32.
[57] *Taser Holsters*, Galls, https://www.galls.com/taser-holsters (last visited Sep. 13, 2023).
[58] Sean Murphy, *Explainer: How Does Someone Confuse a Gun for a Taser?*, AP News (Dec. 22, 2021), https://apnews.com/article/death-of-daunte-wright-science-shootings-minnesota-minneapolis-44798cda3cc0f093de20f54dabec4dec.
[59] *Id.*
[60] Complaint, *Axon Enter., Inc.,* FTC Dkt. No. D9389, ¶ 13 (Jan. 3, 2020).

holsters through supply contracts because it saves time and resources compared to buying component parts separately.

76.     From May 3, 2018 to April 17, 2020, the Holster Agreement was in place, making Safariland the preferred holster supplier of Axon's long-range CEWs. In effect, the parties agreed through this Holster Agreement for Safariland to be the preferred holster supplier for *all* long-range CEWs.

77.     Because of the Holster Agreement, Safariland obtained a dominant monopoly over long-range CEW holsters, with high barriers to entry because other companies were contractually limited in working with Axon to produce holsters.

## V.     AXON AND SAFARILAND'S CONDUCT TO MONOPOLIZE THE LONG-RANGE CEW AND BWC SYSTEM MARKETS

78.     Insulated by steep barriers to entry in the long-range CEW and BWC system markets, Axon and Safariland have pursued anticompetitive conduct to entrench Axon's monopolies in the long-range CEW and BWC system markets.

79.     In 2018, Axon dominated both the long-range CEW market and the BWC system market, with 95% market share in long-range CEW supply to police departments and 70% market share in BWC system supply.[61] Showcasing Axon's dominance, an Axon company presentation from the time asked its salespeople to "embrace being the gorilla."[62]

80.     Safariland's VieVu was an upstart in the BWC system market, competing with Axon's BWC system by offering lower prices.[63] VieVu secured the New York Police Department's ("NYPD's") BWC system contract in 2016, one of the largest in the country.[64] In

---

[61] Schiefelbein, *supra* note 7.
[62] Complaint, *Axon Enter., Inc.,* FTC Dkt. No. D9389, ¶ 13 (Jan. 3, 2020).
[63] Schiefelbein, *supra* note 7.
[64] Laura Nahmias, *Winning Bid for NYPD Body Camera Contract Comes Under Lobbying Attack*, Politico (Oct. 6, 2016), https://www.politico.com/states/new-york/city-hall/story/2016/10/the-lobbying-war-behind-the-nypds-body-camera-contract-106117.

response, Axon enlisted its lobbyists to malign VieVu's BWC system in a failed attempt to win back the NYPD contract.[65] By early 2018, VieVu had won the contracts of six of the largest 90 U.S. police departments.[66] This made VieVu the second-largest provider of BWC systems to large police departments and, significantly, Axon's main competitor.[67]

81.    VieVu continued to compete with Axon for BWC system contracts by offering lower prices to police departments. This competition forced Axon to lower prices on its BWC systems. In 2017, Axon was forced to offer free BWC systems for one year in order to promote its BWC system against this competition from VieVu.[68] Axon admitted that VieVu was "undercutting" the company on price for BWC systems, while VieVu's CEO noted that VieVu has started a "price war" with Axon.[69]

82.    Safariland was a large manufacturer of less-lethal weapons through its Defense Technology brand. Its products included pepper spray and rubber bullets, as well as weapon holsters. These products allowed it to develop relationships with police departments and become a trusted supplier of less-lethal weapons.[70] Safariland viewed VieVu as a key part of its offerings, noting that it owned "the #2 player in the market, and to date we have seen no other credible market entrant."[71]

83.    Rather than compete with VieVu and Safariland, Axon instead acquired VieVu from Safariland on May 3, 2018 for $7.1 million.[72] The merger eliminated Axon's closest and only viable competitor for BWC systems.

---

[65] *Id.*
[66] Schiefelbein, *supra* note 7.
[67] Complaint, *Axon Enter., Inc.,* FTC Dkt. No. D9389, ¶¶ 35–39 (Jan. 3, 2020).
[68] Farivar, *supra* note 47.
[69] Complaint, *Axon Enter., Inc.,* FTC Dkt. No. D9389, ¶¶ 3–5.
[70] David Griffith, *Less-Lethal: Making Impact*, Police Mag (Mar. 10, 2017), https://www.policemag.com/weapons/article/15346564/less-lethal-making-impact.
[71] Complaint, *Axon Enter., Inc.,* FTC Dkt. No. D9389, ¶ 36.
[72] *Id*. ¶ 19.

84.     At the time, stock analysts and others recognized that VieVu was Axon's largest competitor. Bloomberg ran an article on May 4, 2018 titled "The Biggest Police Body Cam Company Is Buying Its Main Competitor," and asserted that "[t]he combination of the two largest providers of the recording devices will create a dominant force in police surveillance."[73] That month, the Motley Fool ran an article titled "Axon Enterprise Now Owns the Police Body Cam Market" and declared that "[t]here is going to be no stopping Axon Enterprise (NASDAQ:AAXN) now that it has acquired its main body camera rival VIEVU."[74]

85.     "As additional consideration" for the acquisition, Axon signed a Product Development and Supplier Agreement ("Holster Agreement") with Safariland. The FTC noted that the "Holster Agreement is a decade-long supply agreement whereby Respondent Safariland would develop and exclusively supply [long-range CEW] holsters to Respondent Axon for its Taser-branded CEW," while Safariland would be Axon's "preferred supplier of CEW holsters."[75]

86.     Axon also entered into several decade-long non-compete and no-poach agreements with Safariland. First, Axon and Safariland entered into non-compete agreements: "Safariland agreed not to compete (i) for products and services that Respondent Axon supplies and in industries where Respondent Axon is active, irrespective of their relation to the [acquisition] and (ii) for Respondent Axon's customers; and both [Defendants] agreed not to affirmatively solicit each other's employees."[76] Safariland also "agreed not to engage in '(a) [BWC] products and services, (b) in-car video products and services, (c) [DEMS] products and services provided to

---

[73] Joshua Brustein, *The Biggest Police Body Cam Company Is Buying Its Main Competitor*, Bloomberg (May 4, 2018), https://www.bloomberg.com/news/articles/2018-05-04/the-biggest-police-body-cam-company-is-buying-its-main-competitor#xj4y7vzkg.
[74] Rich Duprey, *Axon Enterprise Now Owns the Police Body Cam Market,* Motley Fool (May 18, 2018), https://www.fool.com/investing/2018/05/18/is-there-any-stopping-axon-enterprise-now.aspx.
[75] Complaint, *Axon Enter., Inc.,* FTC Dkt. No. D9389, ¶¶ 13, 19.
[76] *Id*. ¶ 44.

third parties that ingest digital evidence audio and video files, and (d) enterprise records management systems provided to third parties'" worldwide for 10 years.[77] Safariland further agreed to refrain from competition in the "CEW industry, BWC industry, fleet or vehicle camera industry, surveillance room camera industry, and [DEMS] and storage industry, with regard to law enforcement, military, security or consumers" worldwide for 12 years.[78]

87.     According to the FTC complaint, "Respondent Axon was concerned about Respondent Safariland potentially entering into competition with Respondent Axon's lucrative [long-range] CEW business. Respondent Axon's CEO called the 12-year CEW non-compete a 'hidden jewel in the deal.'"[79]

88.     Axon and Safariland's agreements also contained non-solicitation agreements. Safariland "agreed not to solicit or entice any of Respondent Axon's customers or potential customers for purposes of diverting business or services away from Respondent Axon, for 10 years."[80] Similarly, "Safariland agreed not to solicit or entice any of Respondent Axon's customers or potential customers for purposes of diverting CEW, CEW holster, or CEW accessory business or purchases away from Respondent Axon, for 11 years."[81]

89.     Finally, Axon and Safariland's agreements contained no-poach agreements. Axon and Safariland agreed "not to hire or solicit" any of each other's employees for 10 years.[82]

90.     The VieVu acquisition agreement and related non-compete agreements with Safariland, in effect, eliminated the threat in both Axon's long-range CEW market from Safariland and Axon's BWC system market from VieVu.

91.     In the wake of these agreements, the FTC filed an administrative complaint on

---

[77] *Id*. ¶ 45.
[78] *Id*. ¶ 46.
[79] *Id*.
[80] *Id*. ¶ 47.
[81] *Id*. ¶ 48.
[82] *Id*. ¶¶ 49–50.

January 3, 2020 against Axon and Safariland to challenge the Axon–VieVu acquisition and related Axon– Safariland agreements, which the FTC alleged were harming competition. The FTC complaint, which was approved by all five FTC commissioners, alleged that Axon and Safariland substantially lessened competition in the BWC system market, in violation of Section 5 of the FTC Act and Section 7 of the Clayton Act. The FTC's administrative complaint acknowledged that Axon's acquisition of VieVu eliminated Axon's closest competitor in the highly concentrated BWC system market.

92.     Safariland settled with the FTC on April 17, 2020. Under the terms of the settlement agreement, Safariland must obtain approval from the FTC before entering into any non-compete or similar agreements with Axon.[83] The FTC's litigation against Axon is still ongoing, pending Axon's challenge to the FTC's administrative process in federal court, *Axon Enterprise, Inc. v. FTC*, 452 F. Supp. 3d 882 (D. Ariz. 2020), *aff'd by* 986 F.3d 1173 (9th Cir. 2021), *rev'd by* 598 U.S. 175 (2023).

93.     Since the VieVu acquisition and related non-compete agreements with Safariland, Axon has faced no threats to its long-range CEW or BWC system dominance. Axon remains the market leader of both long-range CEWs and BWC systems, with 90% of the long-range CEW market and 70% of the BWC system market.[84] Through its acquisition, market-allocation, and non-compete agreements, Axon has effectively prevented rivals from competing for its top market position.

## VI.    HARM TO COMPETITION AND ANTITRUST INJURY

94.     Axon and Safariland's conduct harmed competition in the United States for long-range CEWs, BWC systems, and long-range CEW components by creating higher prices for

---

[83] Press Release, FTC, *supra* note 9.
[84] Duprey, *supra* note 10.

purchasers than there would have been in a competitive market.

95.     Taser prices have remained at supracompetitive levels and increased from 2018 to 2023. For example, Charlotte, North Carolina paid $2.1 million/year for a supply of Tasers and body cameras from 2015–2021, including a 2017 contract for 1,743 Tasers.[85] In 2022, the city signed a five-year contract with Axon for $21.6 million, which included annualized costs of $1.5 million alone to replace its current stock of Tasers and supply components like cartridges.

96.     Prices for BWC systems have increased from 2018 to 2023 and are supracompetitive.  Axon negotiates pricing for BWC systems typically for 5–10 year contracts. For example, in 2016, the city of Columbus, Ohio paid $9.1 million to Axon competitor WatchGuard (now owned by Motorola Solutions, Inc.) for a five-year BWC system that provided 1,575 body cameras.[86] When Columbus signed a new contract in 2022 with Axon, the price doubled: it committed to pay Axon $19 million over five years, which included only a modest increase to 2,105 body cameras, plus 450 in-car cameras.[87]

97.     For police department users, Axon now bundles together its supply of Tasers and BWC systems. Axon negotiates supply for both services in one contract, allowing it extract even higher prices. For example, in 2014–15, Oklahoma City paid around $630,000 and $683,325 for five-year contracts of at least 305 Tasers and a BWC system with 305 body cameras (supplied by competitor WatchGuard).[88] Under its new contract, all with Axon, it pays $28.9 million over ten

---

[85] City of Charlotte, *CMPD Body-Worn Camera Program* 2 (2022); https://www.charlottenc.gov/files/sharedassets/city/v/1/city-government/departments/documents/audit/report/fy2022/22-08-cmpd-body-worn-camera-program.pdf. .

[86] Mark Ferenchik, *Columbus, Ohio, Approves $9 Million Police Body Camera Contract*, Gov't Tech. (Dec. 6, 2016), https://www.govtech.com/public-safety/columbus-ohio-approves-9-million-body-camera-contract-for-police.html.

[87] *Columbus City Leaders Announce Body-Worn Camera Upgrades with Automatic Activation*, ABC 6 (Mar. 22, 2022), https://abc6onyourside.com/news/local/mayor-andrew-ginther-department-of-public-safety-city-leaders-announce-next-generation-visual-enhancements-audio-quality-body-worn-camera-program-3-22-2022.

[88] Josh Wallace, *Oklahoma City Body Camera Program Full Implemented*, Oklahoman (Feb. 17, 2018), https://www.oklahoman.com/story/news/local/oklahoma-city/2018/02/17/oklahoma-city-body-camera-program-full-implemented/60542805007/; Brian Brus, *Shock Value: OKC Selling Back Its Obsolete Tasers*, J. Record (Nov.

years for a full supply agreement with 500 Tasers and 665 body cameras—of which, $18.7 million is allocated to Tasers and BWC systems.[89] These contracts represent a per-year cost increase for Tasers and BWC systems from just under $263,000 to $1.9 million, an increase of 611% when its supply of Tasers and body cameras increased by less than 100%.

98.     These heavy price increases indicate that prices for long-range CEWs and BWC systems have been artificially elevated above competitive levels.

99.     By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury, having paid higher prices for long-range CEWs and/or BWC systems than they would have paid in the absence of Axon's illegal monopolies and unlawful practices, as well as Axon and Safariland's market-allocation conspiracy and conspiracies to monopolize the long-range CEW and BWC system markets. As a result, Plaintiff and the Class have suffered damages.

100.    By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury, having paid higher prices for long-range CEW components like holsters during the life of the Holster Agreement than they would have paid in the absence of Axon and Safariland's market-allocation conspiracy, and as a result, have suffered damages.

101.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.  CLASS ACTION ALLEGATIONS

102.    Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Class:

> All direct purchasers of Axon-produced Taser-branded long range
> conducted-energy weapons ("CEWs") or Axon body-worn camera

---

22, 2017), https://journalrecord.com/2017/11/22/shock-value-okc-selling-back-its-obsolete-tasers/.
[89] Okla. City Aug. 15, 2021 Master Services & Purchasing Agreement.

systems ("BWC systems"), and all purchasers of components for Taser-branded long-range CEWs sold by Axon or Safariland, within the United States during any time from May 3, 2018 until the effects of Defendants' unlawful conduct cease ("Class Period").

103.    Excluded from the class is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

104.    **Class Identity**: The Class is readily identifiable from documents and records in the Defendants' custody, possession, and control or may otherwise be discernable from existing records.

105.    **Numerosity**: Plaintiff does not know the precise number of members of the proposed Class because such information presently is in the control of Defendants. Even though the exact number of members of the Class is unknown at this time, based on the nature of the trade and commerce involved, Plaintiff reasonably believes that there are thousands of members in the Class and that their identities can be readily ascertained from records in the possession of Defendants and third parties.

106.    **Typicality**: Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff directly purchased long-range CEWs, BWC systems, and/or long-range CEW components from Defendants and paid artificially elevated prices for these products as a result of Defendants' conduct, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class, and the relief sought is common to the Class.

107.    **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class that purchased long-range CEWs, BWC systems, and long-range CEW components from

28

Defendants, and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

108.    **Common Questions Predominate**: There are questions of law and fact common to the Class, including, but not limited to:

A.    The applicable product market(s);

B.    The applicable geographic markets(s);

C.    Whether the alleged product-and customer-allocation conspiracies violated the federal antitrust laws, including specifically Section 1 of the Sherman Act, 15 U.S.C. § 1.

D.    Whether the alleged conspiracies to monopolize the markets for long-range CEWs and BWC systems violated the federal antitrust laws, including specifically Section 2 of the Sherman Act, 15 U.S.C. § 2.

E.    Whether the alleged monopolization and attempts to monopolize the long-range CEW and BWC system markets violated the federal antitrust laws, including specifically Section 2 of the Sherman Act, 15 U.S.C. § 2.

F.    Whether the alleged unlawful acquisition violated the federal antitrust laws, including specifically Section 7 of the Clayton Act, 15 U.S.C. § 18, by lessening competition in the BWC system market.

G.    Whether the conduct of Axon and Safariland, as alleged in this Complaint, caused injury to the Plaintiff and other Class Members;

H.    The effect(s) of Axon and Safariland's alleged conspiracies on the prices paid by Plaintiff and other Class members for long-range CEWs, BWC systems, and long-range CEW components during the Class Period;

I.    The effect(s) of Axon's alleged monopoly or alleged attempted monopoly on the

prices paid by Plaintiff and other Class members for long-range CEWs and BWC systems during the Class Period;

J.      Whether Plaintiff and other Class members are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

K.      In addition to injunctive relief, the appropriate Class-wide measure of damages, including whether Plaintiff and other Class members are entitled to: (1) monetary relief, including treble damages, as well as the appropriate class-wide measure of damages; (2) interest from the date they should have received all monies rightfully owed; (3) attorney's fees and costs; and (4) any other relief the Court deems just and reasonable.

These and other questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class.

109.   **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual Class members compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Furthermore, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.   CONTINUING VIOLATION

110.   As described above, Plaintiff purchased its long-range CEWs, BWC systems, and/or long-range CEW components at prices that were artificially inflated during the four-year statutory period preceding this Complaint as a result of Defendants' anticompetitive, exclusionary, and predatory actions. Defendants' setting of those prices constituted a new overt act causing injury to the proposed Class.

## IX.   TOLLING

111.   Under the Clayton Act, the running of the statute of limitations is tolled "during the pendency" of a government action about the same matter "and for one year thereafter." Clayton Act § 5(i), 15 U.S.C. § 16(i). As courts have interpreted § 5(i), tolling applies whenever the federal government initiates a civil or criminal antitrust action, the private suit is "based in whole or in part on any matter complained of" in the government action, and the private suit is "filed within one year of the termination of the government action."[90]

112.   The FTC initiated a government action against Defendants based on the acquisition of VieVu and Defendants' associated non-competition agreements. Because Axon launched a collateral attack on the FTC administrative complaint, the FTC's case against Axon remains pending.[91] The administrative complaint qualifies for tolling the statute of limitations on related private actions.[92]

113.   This complaint, which is based on the acquisition of VieVu and Defendants' anticompetitive non-compete agreements in the long-range CEW and BWC system markets, is "based . . . in part on [a] matter complained of" in the government action, through the VieVu

---

[90] Am. Bar Ass'n, *Antitrust Law Developments* 811 (7th ed. 2012).
[91] *Axon Enterprise and Safariland, In the Matter of,* FTC, https://www.ftc.gov/legal-library/browse/cases-proceedings/1810162-axon-enterprise-safariland-matter (last visited Sep. 13, 2023).
[92] *Rader v. Balfour,* 440 F.2d 469, 471 (7th Cir. 1971) (citing *Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.,* 381 U.S. 311, 313, 321–22 (1965)).

acquisition and non-compete agreements. Because this complaint meets all requirements for Clayton Act § 5(i) tolling, tolling is appropriate, and this complaint has been brought within the statute of limitations.

114.    Further, Defendants' affirmative acts of fraudulent concealment in connection with their anticompetitive conduct in the long-range CEW and BWC system markets prevented Plaintiff and members of the class from having notice of their claims more than four years before filing this Complaint, and tolled the statute of limitations on Plaintiff's claims.

115.    Each of the overt acts in furtherance of the conspiracy alleged in this complaint was done with the purpose of concealing the conspiracy and preventing Plaintiff and other purchasers of long-range CEWs, BWC systems, and long-range CEW holsters from learning about the conspiracy's existence. Accordingly, Plaintiff did not know or reasonably suspect the existence of its claims more than four years before filing this complaint, nor was it aware of any facts more than four years before filing this complaint that would have put it on reasonable notice of its claims. More than four years before Plaintiff filed this complaint, Defendants and their co-conspirators fraudulently concealed the existence of Plaintiff's antitrust claim so that Plaintiff, acting as a reasonable person, did not know of the existence of its claim at the time.

## X.    CAUSES OF ACTION

### COUNT ONE:
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
### Conspiracy in Restraint of Trade (Axon & Safariland)

116.    Plaintiff incorporates and re-alleges, as though fully set forth herein, every allegation set forth in the preceding paragraphs of this Complaint.

117.    Defendants entered into and engaged in a continuing combination, conspiracy, or agreement to unreasonably restrain trade or commerce by artificially reducing or eliminating competition with respect to the sale of long-range CEWs, BWC systems, and long-range CEW

holsters, in violation of Section 1 of the Sherman Act, through their execution of the Holster Agreement, customer and product market-allocation agreements, non-compete agreements, non-solicitation agreements, and no-poach agreements.

118.    Defendants have combined and conspired to divide and allocate the markets for long-range CEWs, BWC systems, and long-range CEW holsters by eliminating each other as competitors, with the intended effect of raising, maintaining, or stabilizing the prices of long-range CEWs, BWC systems, and long-range CEW holsters sold to purchasers in the United States.

119.    Defendants' activities, as set forth herein, constitute a *per se* violation of Section of the Sherman Act.

120.    Defendants' conduct is also unlawful under the rule-of-reason standard of antitrust liability because at all relevant times Axon possessed market power in the markets for long-range CEWs and BWC systems, and Safariland possessed market power in the market for long-range CEW holsters. Defendants' conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.

121.    Defendants' anticompetitive and unlawful conduct has proximately caused injury to Plaintiff and members of the Class by eliminating competition on price, promotional activity, and innovation, reducing consumer choice, and allowing Axon to raise, maintain, or stabilize the prices of long-range CEWs and BWC systems, and Safariland to do the same for long-range CEW holsters sold to purchasers in the United States.

122.    Plaintiff, on behalf of itself and other members of the Class, seeks damages, representing the additional amount Plaintiff and members of the Class paid for long-range CEWs, BWC systems, and long-range CEW components but for Axon and Safariland's conspiracy to allocate these markets, in an amount to be proven at trial.

**COUNT TWO:**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
<u>**Monopolization of the Long-Range CEW Market (Axon)**</u>

123.    Plaintiff incorporates and re-alleges, as though fully set forth herein, every allegation set forth in the preceding paragraphs of this Complaint.

124.    Plaintiff brings this federal law claim on its own behalf and on behalf of each member of the proposed Class described above.

125.    The relevant product market is the long-range CEW market, as set forth herein.

126.    The relevant geographic market is the United States.

127.    Axon possesses monopoly price-setting power in the United States for long-range CEW supply. Axon acquired and maintains that market power though anticompetitive, exclusionary, and predatory conduct, which Axon intended to have, and did actually have, the effect of: a) foreclosing competition in the market for long-range CEWs; and b) inflating the price of long-range CEWs.

128.    As described in more detail above, Axon's purchase of VieVu centered around using its market power to create agreements with would-be competitors and suppress competition.

129.    Axon further used long-term contracts to prevent would-be competitors and suppress competition.

130.    Axon's conduct constitutes unlawful monopolization in violation of Section 2 of the Sherman Act.

131.    As a direct and proximate result of Axon's continuing violation of Section 2 of the Sherman Act, prices of long-range CEWs in the American long-range CEW market have been and continue to be inflated above competitive levels, causing injury to Plaintiff and members of the Class.

132.    Plaintiff, on behalf of itself and other members of the Class, seeks damages,

representing the additional amount Plaintiff and members of the Class paid for long-range CEWs but for Axon's monopolization, in an amount to be proven at trial.

133.    Plaintiff, on behalf of itself and members of the Class, also seeks injunctive relief that terminates the ongoing violations alleged in this Complaint. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**COUNT THREE:**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Attempted Monopolization of the Long-Range CEW Market (Axon)**

134.    Plaintiff incorporates and re-alleges, as though fully set forth herein, every allegation set forth in the preceding paragraphs of this Complaint.

135.    Plaintiff brings this federal law claim on its own behalf and on behalf of each member of the proposed Class described above.

136.    The relevant product market is the long-range CEW market, as set forth herein.

137.    The relevant geographic market is the United States.

138.    If Axon does not already have monopoly power in the United States for long-range CEWs, Axon has attempted to monopolize this market. Axon attempted to possess monopoly price-setting power in the United States for long-range CEW supply. Axon attempted to acquire and maintain that market power though anticompetitive, exclusionary, and predatory conduct, which Axon intended to have the effect of: a) foreclosing competition in the market for long-range CEWs; and b) inflating the price of long-range CEWs.

139.    As described in more detail above, Axon's non-compete agreements with Safariland attempted to prevent would-be competitors and suppress competition.

140.    Axon's aggressive patent enforcement and long-term contracts attempted to prevent would-be competitors and suppress competition.

141.    The anticompetitive conduct described here, undertaken by Axon, creates a

dangerous probability that Axon will achieve monopoly power in the long-range CEW market.

142.    Axon's conduct constitutes unlawful attempted monopolization in violation of Section 2 of the Sherman Act.

143.    As a direct and proximate result of Axon's attempted violation of Section 2 of the Sherman Act, prices of long-range CEWs have been and continue to be inflated above competitive levels, causing injury to Plaintiff and members of the Class.

144.    Plaintiff, on behalf of itself and other members of the Class, seeks damages, representing the additional amount Plaintiff and members of the Class paid for long-range CEWs but for Axon's attempted monopolization, in an amount to be proven at trial.

145.    Plaintiff, on behalf of itself and members of the Class, also seeks injunctive relief that terminates the ongoing violations alleged in this Complaint. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**COUNT FOUR:**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Conspiracy to Monopolize the Long-Range CEW Market (Axon & Safariland)**

146.    Plaintiff incorporates and re-alleges, as though fully set forth herein, every allegation set forth in the preceding paragraphs of this Complaint.

147.    Plaintiff brings this federal law claim on its own behalf and on behalf of each member of the proposed Class described above.

148.    The relevant product market is the long-range CEW market, as set forth herein.

149.    The relevant geographic market is the United States.

150.    Defendants entered into an agreement to maintain and enhance Axon's monopoly in violation of Section 2 of the Sherman Act by engaging in exclusionary conduct designed to prevent competition on the merits in the relevant market for long-range CEWs.

151.    Specifically, pursuant to the Holster Agreement, Safariland agreed not to enter the

long-range CEW market in exchange for Axon's pledge to make Safariland a preferred Taser holster supplier, thereby securing Axon's ability to achieve monopoly profits by eliminating a competitor well situated to compete on price and innovation.

152.    Overt acts in furtherance of this conspiracy consisted of, inter alia: the unlawful non-compete agreements between Axon and Safariland entered into on May 3, 2018 by which Safariland agreed not to compete in the long-range CEW market or solicit Axon's customers or employees in exchange for the preferred treatment of the Holster Agreement and Axon's purchasing VieVu.

153.    Defendants entered into and effectuated this agreement with the specific intent of eliminating competition on the merits, and thereby reaping and sharing artificially inflated monopoly profits in the long-range CEW market.

154.    Defendants' anticompetitive and unlawful conduct proximately caused injury to Plaintiff and members of the Class by eliminating independent competition by Safariland on price, promotional activity, and innovation, reducing consumer choice, and allowing Axon to raise, maintain, or stabilize the prices of long-range CEWs sold to purchasers in the United States.

155.    Plaintiff, on behalf of itself and other members of the Class, seeks damages, representing the additional amount Plaintiff and members of the Class paid for long-range CEWs, but for Defendants' conspiracy to monopolize, in an amount to be proven at trial.

### COUNT FIVE:
### VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
### Monopolization of the BWC System Market (Axon)

156.    Plaintiff incorporates and re-alleges, as though fully set forth herein, every allegation set forth in the preceding paragraphs of this Complaint.

157.    Plaintiff brings this federal law claim on its own behalf and on behalf of each member of the proposed Class described above.

158.    The relevant product market is the BWC system market, as set forth herein.

159.    The relevant geographic market is the United States.

160.    Axon possesses monopoly price-setting power in the United States for BWC system supply. Axon acquired and maintains that market power though anticompetitive, exclusionary, and predatory conduct, which Axon intended to have, and did actually have, the effect of: a) foreclosing competition in the market for BWC systems; and b) inflating the price of BWC systems.

161.    As described in more detail above, Axon's purchase of VieVu centered around using its market power to create agreements with would-be competitors and suppress competition.

162.    As described above, Axon's practice of bundling BWC system supply with long-range CEW supply suppressed competition in the BWC system market.

163.    As described above, Axon's practice of forcing purchasers to sign long-term contracts suppressed competition in the BWC system market by preventing would-be competitors from entering the market.

164.    Axon's conduct constitutes unlawful monopolization in violation of Section 2 of the Sherman Act.

165.    As a direct and proximate result of Axon's continuing violation of Section 2 of the Sherman Act, prices of BWC systems in the BWC system market have been and continue to be inflated above competitive levels, causing injury to Plaintiff and members of the Class.

166.    Plaintiff, on behalf of itself and other members of the Class, seeks damages, representing the additional amount Plaintiff and members of the Class paid for BWC systems but for Axon's monopolization, in an amount to be proven at trial.

167.    Plaintiff, on behalf of itself and members of the Class, also seeks injunctive relief

that terminates the ongoing violations alleged in this Complaint. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**COUNT SIX:**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Attempted Monopolization of the BWC System Market (Axon)**

168.    Plaintiff incorporates and re-alleges, as though fully set forth herein, every allegation set forth in the preceding paragraphs of this Complaint.

169.    Plaintiff brings this federal law claim on its own behalf and on behalf of each member of the proposed Class described above.

170.    The relevant product market is the BWC system market, as set forth herein.

171.    The relevant geographic market is the United States.

172.    If Axon does not already have monopoly power in the United States for BWC systems, Axon has attempted to monopolize this market. Axon attempted to acquire and maintain that market power though anticompetitive, exclusionary, and predatory conduct, which Axon intended to have the effect of: a) foreclosing competition in the market for BWC systems; and b) inflating the price of BWC systems.

173.    As described in more detail above, Axon's purchase of VieVu attempted to use its market power to create agreements with would-be competitors and suppress competition.

174.    As described above, Axon's practice of bundling BWC system supply with CEW supply attempted to suppress competition in the BWC system market.

175.    As described above, Axon's practice of forcing purchasers to sign long-term contracts attempted to suppress competition in the BWC system market by preventing would-be competitors from entering the market.

176.    The anticompetitive conduct described here, undertaken by Axon, creates a dangerous probability that Axon will achieve monopoly power in the BWC system market.

177.    Axon's conduct constitutes unlawful attempted monopolization in violation of Section 2 of the Sherman Act.

178.    As a direct and proximate result of Axon's continuing attempted violation of Section 2 of the Sherman Act, prices of BWC systems in the American BWC system market have been and continue to be inflated, fixed, and stabilized, causing injury to Plaintiff and members of the Class.

179.    Plaintiff, on behalf of itself and other members of the Class, seeks damages, representing the additional amount Plaintiff and members of the Class paid for BWC systems but for Axon's attempted monopolization, in an amount to be proven at trial.

180.    Plaintiff, on behalf of itself and members of the Class, also seeks injunctive relief that terminates the ongoing violations alleged in this Complaint. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**COUNT SEVEN:**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Conspiracy to Monopolize the BWC System Market (Axon & Safariland)**

181.    Plaintiff incorporates and re-alleges, as though fully set forth herein, every allegation set forth in the preceding paragraphs of this Complaint.

182.    Plaintiff brings this federal law claim on its own behalf and on behalf of each member of the proposed Class described above.

183.    The relevant product market is the BWC system market, as set forth herein.

184.    The relevant geographic market is the United States.

185.    Defendants entered into and engaged in an agreement to maintain and enhance Axon's monopoly in violation of Section 2 of the Sherman Act (15 U.S.C. § 2) by engaging in exclusionary conduct designed to prevent competition on the merits in the relevant market for BWC systems.

40

186.     Specifically, in exchange for Axon's purchasing VieVu and signing the Holster Agreement, Safariland agreed to withdraw achieve monopoly profits by eliminating a competitor well situated to compete on price and innovation.

187.     Overt acts in furtherance of this conspiracy consisted of, inter alia: (a) the unlawful customer and product market-allocation agreements between Axon and Safariland entered into on May 3, 2018 by which Safariland agreed not to compete in the BWC system market or solicit Axon's customers or employees, and (b) the unlawful acquisition of VieVu on May 3, 2018 by which Safariland agreed to withdraw from the BWC system market.

188.     Defendants engaged in this with the specific intent of eliminating competition on the merits, and thereby reaping and sharing artificially inflated monopoly profits.

189.     Defendants' anticompetitive and unlawful conduct proximately caused injury to Plaintiff and members of the Class by eliminating independent competition by Safariland on price, promotional activity, and innovation. This conduct has reduced consumer choice and allowed Axon to raise, maintain, or stabilize the prices of BWC systems sold to purchasers in the United States.

190.     Plaintiff, on behalf of itself and other members of the Class, seeks damages, representing the additional amount Plaintiff and members of the Class paid for BWC systems but for Defendants' conspiracy to monopolize, in an amount to be proven at trial.

191.     Plaintiff, on behalf of itself and members of the Class, also seeks injunctive relief that terminates the ongoing violations alleged in this Complaint. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**COUNT EIGHT:**
**VIOLATION OF SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 18**
<u>Unlawful Acquisition of Monopoly Power over BWC Systems</u>

192.    Plaintiff incorporates and re-alleges, as though fully set forth herein, every allegation set forth in the preceding paragraphs of this Complaint.

193.    Plaintiff brings this federal law claim on its own behalf and on behalf of each member of the proposed Class described above.

194.    The relevant product market is the BWC system market, as set forth herein.

195.    The relevant geographic market is the United States.

196.    Axon's acquisition of VieVu from Safariland substantially lessened competition in the relevant market by eliminating one of its potential competitors.

197.    As a direct and proximate result of Axon and Safariland's violation of Section 7 of the Clayton Act, prices for BWC systems in the United States have been and continue to be inflated, fixed, and stabilized, causing injury to Plaintiff and members of the Class.

## XI.    REQUEST FOR RELIEF

198.    WHEREFORE, Plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully requests judgment against Axon and Safariland as follows:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.    The unlawful customer and product market-allocation conspiracies alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act; the monopolies, attempted monopolies, and conspiracies to monopolize alleged

herein be adjudged and decreed in violation of Section 2 of the Sherman Act; Plaintiff and the Class recover damages, to the maximum extent allowed under the Sherman Act; and that a judgment in favor of Plaintiff and the members of the Class be entered against Axon and Safariland in an amount to be trebled;

C.  Axon and Safariland, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein; from entering into any other conspiracy alleged herein; from entering into any other contract, conspiracy, or combination having a similar purpose or effect; and from adopting or following any practice, plan, program, or device having a similar purpose or effect.

D.  The unlawful acquisition of VieVu by Axon alleged herein be adjudged and decreed in violation of Section 7 of the Clayton Act; Plaintiff and Class recover damages, to the maximum extent allowed under the Clayton Act, and that a judgment in favor of Plaintiff and the members of the Class be entered against Axon and Safariland in an amount to be trebled;

E.  Plaintiff and the members of the Class be awarded pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

F.  Plaintiff and the members of the Class recover their costs of suit, including reasonable attorney's fees, as provided by law; and

G.     Plaintiff and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## XII.  JURY TRIAL DEMANDED

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: October 4, 2023           By: /s/ *William G. Caldes*

                            William G. Caldes (SBN 00062-1995)
                            John A. Macoretta (SBN 03912-1990)
                            Diana J. Zinser (*pro hac vice forthcoming*)
                            SPECTOR ROSEMAN & KODROFF, P.C.
                            2001 Market Street, Suite 3420
                            Philadelphia, PA  19103
                            Tel: (215) 496-0300
                            Facsimile: (215) 496-6611
                            bcaldes@srkattorneys.com
                            jmacoretta@srkattorneys.com
                            dzinser@srkattorneys.com

                            Michael S. Smith (*pro hac vice forthcoming*)
                            Michael D. Hanify (*pro hac vice forthcoming*)
                            PRETI, FLAHERTY, BELIVEAU &
                            PACHIOS, LLP
                            One City Center
                            P.O. Box 9546
                            Portland, ME  04112-9546
                            Tel.: (207) 791-3000
                            Fax: (207) 791-3111
                            msmith@preti.com mhanify@preti.com

                            *Attorneys for Plaintiff and the Proposed Class*